**PUMPS AND POWER COMPANY, Appellee,**

v.

**SOUTHERN STATES INDUSTRIES, INC., Appellant.**

No. 85–1212.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1985.

Decided April 3, 1986.

Rehearing Denied May 8, 1986.

Henry N. Means, III, Little Rock, Ark., for appellant.

Ian W. Vickery, El Dorado, Ark., for appellee.

Before ROSS, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.

ROSS, Circuit Judge.

This case concerns the restricted distribution of "T–Series pumps" manufactured by the Gorman-Rupp Company of Mansfield, Ohio for use as the key component of certain sewage treatment equipment known as pump lift stations. Appellee, Pumps and Power Company of El Dorado, Arkansas, builds a self-priming, top-mounted suction lift station which it markets as the Pumper Pack to cities and other subdivisions (end-users) engaged in waste water treatment operations. Pumps and Power purchases (rather than manufactures) the component parts of the Pumper Pack. Because of promotional and service efforts by Gorman-Rupp and its distributors as well as the inherent quality of the product, the Gorman-Rupp T–Series pump is apparently a highly desirable component of the kind of pump lift station marketed by Pumps and Power.

Pumps and Power initially filed suit under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982), against Gorman-Rupp

and two of its distributors, Menge Pump and Machinery Company and appellant, Southern States Industries, alleging a concerted refusal to deal with Pumps and Power in the sale of Gorman-Rupp T–Series pumps. While there are at least five or six other manufacturers of functionally equivalent pumps, Pumps and Power considers itself at a competitive disadvantage in the lift station product market by its lack of access to Gorman-Rupp pumps, referred to in the record as the "cadillac of pumps."

Shortly before trial, Gorman-Rupp and Menge Pump and Machinery Company settled with appellee. Pumps and Power tried the case against the remaining defendant, Southern States, under section 1 of the Sherman Act and won a jury verdict of $10,000 which was then trebled. 15 U.S.C. § 15 (1982). Southern States appeals the district court's denial of its motions for directed verdict and judgment notwithstanding the verdict. Because we find that the record lacks sufficient evidence of concerted action involving appellant, Southern States, to support the jury's verdict, we reverse.

## I.

Between 1959 and 1972, Gorman-Rupp sold sewage lift station pumps to Pumps and Power pursuant to a waste water equipment sales agreement. During this period, Pumps and Power distributed Gorman-Rupp pumps and, after 1965, marketed its own lift stations. Not long after Pumps and Power developed the Pumper Pack, Gorman-Rupp began to manufacture its own lift stations. Then in 1972, Gorman-Rupp terminated Pumps and Power's distributorship agreement[1] but permitted appellee to continue to purchase pumps as an original equipment manufacturer (O.E.M.). O.E.M. status meant that while Pumps and Power could no longer acquire Gorman-Rupp pumps for resale, it could purchase them for installation into the Pumps and Power lift station product. As an O.E.M., Pumps and Power received a discount and a ready supply of Gorman-

Rupp pumps. In addition, Pumps and Power was able to purchase pumps from Gorman-Rupp distributors at an even greater discount than that offered by the manufacturer. Therefore, Pumps and Power was satisfied with its position as a Gorman-Rupp approved O.E.M. until 1979 when Gorman-Rupp decided to cease selling its pumps to original equipment manufacturers entirely.

In a letter dated October 5, 1979, Gorman-Rupp notified Pumps and Power as well as other customers who assembled package lift stations incorporating Gorman-Rupp pumps that effective January 1, 1980, Gorman-Rupp would no longer sell its sewage pumps to lift station original equipment manufacturers. The decision to cease pump sales to O.E.M.'s grew out of Gorman-Rupp's prior entry into the sewage lift station market as a direct competitor, through its distributors, of Pumps and Power and other sellers of sewage lift stations.

Pumps and Power continued to find distributors who were willing to supply it with Gorman-Rupp pumps. However, in August 1982, Gorman-Rupp issued a policy statement to all of its distributors containing the following language:

In 1979, we decided to stop selling our pumps to manufacturers who installed the pumps in their own lift stations, which they thereafter sold in competition with us. We also incorporated this as a policy for all our distributors. We did this for two reasons. First, our Waste Water distributors work very hard to assist the engineering firm hired by the end user both to design the lift station desired by the user and to specify our pump for use in that station. Other manufacturers frequently do not incur this engineering cost and, as a result, could bid against us at a lower price if they could obtain our pumps. This "free ride" would cause financial loss both to our distributors and to us. We also believed that sales to other manufacturers

---

1. Pumps and Power expressly disavowed any effort to implicate Southern States in Gorman-Rupp's 1972 cancellation of Pumps and Power's distributorship.

would make our Waste Water distributors hesitant in the future to invest the time and expense that is necessary to obtain a Gorman-Rupp specification. Second, an improperly selected or installed pump may cause performance problems for the customer and may damage our reputation and cause a loss of goodwill.

For these reasons, we want to reiterate our policies with respect to the sale of our pumps for use in lift stations. * * * [N]o distributors are authorized to sell our pumps to competing Lift Station manufacturers.

To enforce these policies, effective immediately the profit or commission passover on any pumps sold by a distributor for use in lift stations that are not designed by Gorman-Rupp will be 100%—50% for the Waste Water Equipment distributor responsible for the specification; 25% for the distributor in whose areas the station will be located to cover warranty service; and 25% for The Gorman-Rupp Company to cover our own engineering and promotion costs.

Moreover, as in the past, sales by a distributor contrary to our policies also constitute just cause to cancel that distributor's Sales Agreement. Thank you for your cooperation.

The policy statement was signed by John Eichinger, Director of Marketing for Gorman-Rupp. An attached summary succinctly stated, in pertinent part:

> Do not sell Gorman-Rupp pumps to competing Lift Station manufacturers. (Pay a 100% Profit Passover Commission if you do.)

2. Pumps and Power was able to "bootleg" Gorman-Rupp pumps from distributors who were willing to supply pumps if their identities were concealed from Gorman-Rupp. Pumps and Power altered and falsified serial numbers on the pumps it was able to obtain in this manner.

3. The letter, dated December 21, 1973, stated: "Effective immediately, orders for Gorman-Rupp pumps should be directed to Gorman-Rupp c/o Southern States Industries. You will be invoiced directly by Gorman-Rupp at their

At this point, Pumps and Power began to experience substantial difficulty in obtaining a supply of Gorman-Rupp pumps from any source.[2]

On the other hand, long before the 1979 and 1982 communications from Gorman-Rupp to its distributors, Southern States had already, for its own reasons, phased out its business dealings with Pumps and Power. As direct competitors for lift station customers in the same general territory, both Southern States and Pumps and Power recognized the disadvantages of dealing with each other in the sale of Gorman-Rupp pumps.

In 1973, Southern States sent a letter[3] to Pumps and Power indicating that future orders for pumps would be forwarded by Southern States to Gorman-Rupp for processing. In addition, such orders were to designate the ultimate destination of the pumps.[4] Jack Kelley, President of Southern States, identified 1973 or shortly thereafter as the date when Southern States decided to stop selling Gorman-Rupp pumps to original equipment manufacturers such as Pumps and Power. He explained the basis for this decision as follows:

> I spend a lot of time and my salesmen spend a lot of time out talking to consulting engineers promoting the Gorman-Rupp equipment, encouraging them to use it in their specifications. Now, it would be foolish of me to go out and promote the sale of a Gorman-Rupp station and then turn around and sell Gorman-Rupp pumps to an O.E.M. such as Pumps & Power and have them bid against me, that's just not good business sense to do that.

regular OEM terms. All orders should show the location of the user in order to determine the commission splits. If you have any questions or desire more information, please contact us."

4. Southern States and other Gorman-Rupp distributors operate in territories of primary responsibility, and a commission on the sale of Gorman-Rupp equipment is allocated to the distributor in whose territory the ultimate customer is located regardless of who makes the sale.

Kelley testified that after the 1973 letter, Southern States received no pump orders from Pumps and Power until after this lawsuit had been filed ten years later.

Jules Feinberg, General Manager of Pumps and Power, conceded that his company did not pursue Southern States as a likely source of Gorman-Rupp pumps because of their position as direct competitors in the same trade territory. He added that Southern States did not maintain a very large inventory of pumps for resale and did not offer as attractive a discount as other sources. More important, "they wanted the location of the user in order to determine the commission splits. Well, we don't think it's good business for us to tell our competitors who our customers are."

## II.

■ Section 1 of the Sherman Act prohibits contracts, combinations or conspiracies which unduly restrain trade. Absent monopoly power, which Southern States does not possess, a supplier's unilateral refusal to sell to another, whatever the motivation, does not violate the antitrust laws. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 473 (3rd Cir.1985); *Becker v. Egypt News Co.*, 713 F.2d 363, 366 (8th Cir.1983). Pumps and Power therefore bore the burden of proving that Southern States' unavailability as a source of Gorman-Rupp pumps was the result, not of independent action, but of agreement or concerted action between Southern States and another entity. *Monsanto, supra*, 465 U.S. at 763, 104 S.Ct. at 1470.

Unless an antitrust plaintiff offers "evidence that tends to exclude the possibility" of independent action, an inference of conspiracy is unreasonable. *Id.* at 764, 104 S.Ct. at 1471; *Park v. El Paso Board of Realtors*, 764 F.2d 1053, 1060 (5th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986). The standard is whether the evidence, direct or circumstantial, "reasonably tends to prove that the [alleged violator] and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto, supra*, 465 U.S. at 764, 104 S.Ct. at 1471 (citations omitted). "Circumstances must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Id.* (citation omitted).[5]

Pumps and Power focused its efforts at trial on proving a conspiracy between Gorman-Rupp and Southern States with the unlawful object of unreasonably restraining competition in the self-priming, top-mounted lift station product market. We need not decide whether the refusal to supply Gorman-Rupp pumps to appellee should be characterized as a nonprice vertical restraint in the nature of a customer restriction, an exclusive distribution arrangement or a group boycott, because we find no evidence that Southern States conspired with Gorman-Rupp or any other entity.[6]

In attempting to establish that Southern States combined or conspired with Gorman-Rupp, Pumps and Power relied on the following evidence: Jack Kelley of Southern States was in regular contact with Mel McGuire, a district representative of Gorman-Rupp. When asked whether he had complained to Gorman-Rupp about the difficulties in competing with lift station original equipment manufacturers, Kelley stated, "I am confident I talked to Mel McGuire about that situation." Appellee

---

5. *Monsanto* dealt with termination of a distributor pursuant to a resale price-fixing conspiracy. However, the standard set forth in *Monsanto* governing proof of agreement or concert under section 1 of the Sherman Act has been applied to other restraints, including a manufacturer's instruction to its distributors not to sell the manufacturer's product to a competitor. *See*

*Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 763 F.2d 604, 612 n. 14, 614 (4th Cir.1985) (finding no antitrust violation).

6. The record is devoid of evidence that Southern States combined or conspired with any other Gorman-Rupp distributor.

also relies on the following colloquy as evidence of conspiracy:

Q: [P]rior to the August, 1982, statement coming from Gorman-Rupp, you discussed its general contents with Mr. McGuire, did you not?

Kelley: Yes, I did. I am sure I did.

Q: [W]hen the statement itself was issued, I believe your words were "we welcomed it"?

Kelley: I welcomed it.

Q: Well, "I" on behalf of Southern States?

Kelley: Correct.

Q: And as I also understand your statement, you said, "I accepted it"?

Kelley: I also accepted it, yes.

■ It is clear, however, after *Monsanto*, that conspiracy cannot be established merely by proof of the kind of manufacturer-distributor discussions on which appellee relies. *See Monsanto, supra*, 465 U.S. at 762, 104 S.Ct. at 1470:

[T]he fact that a manufacturer and its distributors are in constant communication * * * does not alone show that the distributors are not making independent * * * decisions.

Moreover, the existence of dealer complaints, even when coupled with manufacturer action in response to the information originating in the complaints, does not indicate the kind of commitment to a common scheme required by section 1 of the Sherman Act.

Permitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about "in response to" complaints, could deter or penalize perfectly legitimate conduct.

* * * Moreover, distributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently. To bar a manufacturer from acting solely because the information upon which it acts originated as a * * * complaint would create an irrational dislocation in the market.

*Id.* at 763–64, 104 S.Ct. at 1470. *Accord National Marine Electronic Distributors, Inc. v. Raytheon Co.*, 778 F.2d 190, 192–93 (4th Cir.1985); *Roesch, Inc. v. Star Cooler Corp.*, 712 F.2d 1235, 1237–38 (8th Cir. 1983), *cert. denied*, 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984).

■ Regardless of Kelley's attitude upon receipt of Gorman-Rupp's 1982 announcement, the record contains no evidence that Kelley solicited the Gorman-Rupp policy, that he communicated agreement to Gorman-Rupp or that he took any action pursuant to the announcement. *Cf. Monsanto, supra*, 465 U.S. at 764 n. 9, 104 S.Ct. at 1471 n. 9 ("The concept of 'a meeting of the minds' or 'a common scheme' * * means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer.").

Most important, years before Gorman-Rupp's 1979 decision to stop supplying original equipment manufacturers with pumps and Gorman-Rupp's 1982 announcement to its distributors, Southern States had implemented its own policy, for sound business reasons, of discouraging pump orders from competitor O.E.M.'s.[7] Pumps and Power offered no evidence that South-

7. Jack Kelley of Southern States testified as follows regarding the August 1982 letter from Gorman-Rupp to its distributors:

Q: [W]ere you consulted on that letter?
Kelley: Never.
Q: Did they ask you anything about that?
Kelley: No.
Q: Did they ask you to agree to it?
Kelley: They did not ask me to agree to it. They simply sent it to me.

Q: Did you consider that letter a threat?
Kelley: I did not. It really didn't change things as far as I was concerned, I wasn't selling to O.E.M.'s at that time anyway. Basically the letter said, we encourage you not to sell pumps to lift station manufacturers and it had been my policy for years ahead of that time not to do that.

ern States' policy in this regard was anything other than an independent business decision by Southern States in its own self-interest.

In addition, the record contains no evidence to support a finding that Southern States' decision to stop supplying components to its own competitors was affected by or continued in response to Gorman-Rupp's communications years later. Nor can Southern States be held responsible for Gorman-Rupp's effort in 1982 to secure systemwide distributor cooperation in a market strategy parallel to that unilaterally adopted by Southern States in the early 1970's.

■ In the proper context, evidence of parallel nondealing may sometimes support an inference of conspiracy. However, evidence of parallel refusals to deal "has no significant probative force" where, as here, at least one of the primary actors "can fully explain how independent business judgment * * * led to such a refusal." *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485, 494 (5th Cir.1982). *Accord Park v. El Paso Board of Realtors, supra,* 764 F.2d at 1060; *Transource International, Inc. v. Trinity Industries, Inc.*, 725 F.2d 274, 281 (5th Cir.1984). *Cf. Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 614 (4th Cir.1985) ("Lees' action in instructing other Lees distributors not to sell to Terry's [was] consistent with Lees' anti-bootlegging policy, which [was] part of its overall marketing strategy" and thus was not probative of an alleged conspiracy between Lees and one of its distributors). Absent concerted action, the antitrust laws do not compel a nonmonopolist supplier to furnish a direct competitor with a component part of the finished product as to which the two compete.

■ In determining whether a party is entitled to judgment notwithstanding an adverse jury verdict, we must view the evidence in the light most favorable to the party who prevailed before the jury. *Bell v. Gas Service Co.*, 778 F.2d 512, 514 (8th Cir.1985). In doing so, we

(1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*Jones v. Edwards*, 770 F.2d 739, 740 (8th Cir.1985) (citations omitted). Judging the evidence in the light most favorable to Pumps and Power, we are convinced that the district court erred in refusing to grant Southern States' motion for judgment notwithstanding the verdict. The record contains no proof, beyond speculation, upon which a finding of combination, conspiracy or concerted action involving Southern States can rationally be based. Accordingly we reverse the judgment of the district court.