ES DEVELOPMENT, INC., and Edwin G. Sapot, Appellees,

v.

RWM ENTERPRISES, INC., d/b/a Moore Cadillac; and, Moore Automotive Group, Inc., d/b/a Moore Hyundai, Appellants.

ES DEVELOPMENT, INC., and Edwin G. Sapot, Appellants,

v.

RWM ENTERPRISES, INC., d/b/a Moore Cadillac; and, Moore Automotive Group, Inc., d/b/a Moore Hyundai, Appellees.

ES DEVELOPMENT, INC., and Edwin G. Sapot, Appellees,

v.

RWM ENTERPRISES, INC., and Moore Automotive Group, Inc., Appellants.

ES DEVELOPMENT, INC., and Edwin G. Sapot, Appellants,

v.

RWM ENTERPRISES, INC., and Moore Automotive Group, Inc., Appellees.

Nos. 90–1760, 90–1761, 90–2466 and 90–2467.

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1991.

Decided July 18, 1991.

Rehearing and Rehearing en banc Denied Sept. 3, 1991.

---

David O. Danis, St. Louis, Mo., for appellants.

Michael H. Wetmore, Clayton, Mo. (Alan E. Popkin, St. Louis, Mo., on the brief), for appellees.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and MAGILL, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Appellants, RWM Enterprises, Inc. and Moore Automotive Group, Inc. (RWM/Moore), appeal from an order of the district court,[1] issued pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 (1988), permanently enjoining them from jointly or individually communicating their opposition to the proposed development of an automobile mall by appellees ES Development, Inc. (ESD) and Edwin G. Sapot (Sapot). The district court held that appellants and seven other automobile dealers combined and conspired to attempt to prevent ESD, a prospective competitor, from entering the automobile retail market in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1988). On appeal, appellants assert (1) the conclusions of the district court are not supported by sufficient evidence and (2) the resulting injunction is illegally overbroad. ESD counterappeals on the issue of attorney fees and costs, contending that the district court erred in awarding only 25% of the amount it found to be reasonable. We affirm the findings and judgment of the district court as amply supported by the evidence and affirm the fee award. However, we remand for modification of the injunction.

## I. BACKGROUND

ESD is a Missouri real estate development corporation founded by Sapot, who is its president and sole shareholder. ESD's sole pursuit was to develop an automobile mall in St. Louis County, Missouri. The mall would operate in the manner of a condominium complex. ESD would finance and construct the necessary facilities for multiple auto dealerships to operate. It would then sell outright to each participating dealer a dealership space within the mall. The participating dealers would share common ownership of the mall's service facility and share common expenses like advertising.[2]

ESD accordingly entered into various option contracts to secure the right to purchase a contiguous ninety acre tract of land in Chesterfield, Missouri, upon which it planned to develop what would be known as the Chesterfield Auto Mall ("Mall"). To date, ESD and Sapot have spent approximately $350,000 in the development of the Mall. These expenditures include the cost of purchasing the land options as well as the costs associated with securing the approval of various state and local governmental agencies for the development of the project. The associated costs include engaging the professional services of an engineering company, an accounting firm, an architectural firm, a construction company, a media consultant and a project banker.

The ultimate success of the development of course depended upon the willingness of automobile manufacturers to commit new dealerships to, or relocate existing dealerships in, the Mall. The automobile manufacturers typically base their decisions to award a new franchise upon market studies addressing the need for and financial prospects of opening a dealership in a particular area, including the effect a new dealership might have on the profitability of existing same-line dealerships in the relevant market. ESD, through Sapot, contacted various automobile manufacturers, a number of which expressed initial interest in the project. As part of his discussions with the manufacturers, Sapot made inquiries into the prospect of personally acquiring and operating at least one of the dealerships to be placed in the Mall. Plaintiffs

---

1. The Honorable Stephen H. Limbaugh, United States District Judge for the Eastern District of Missouri.

2. The parties agree that the automobile mall concept is of recent vintage and had not yet been attempted in the St. Louis market area.

also separately contacted various local dealerships about the possibility of relocating in the Mall, again receiving favorable initial reactions. Although the plaintiffs' inquiries met with a favorable initial reception, none of the manufacturers or dealers made a firm commitment to the Mall.

ESD's activities caught the attention of several dealership owners within the general market area of the anticipated Mall site, causing some of them considerable concern. If operating as planned, the Mall would contain numerous car dealerships at a single site and thus provide consumers with the convenience of one-stop shopping. Some dealers therefore feared that the establishment of a same-line dealership in the Mall could divert car shoppers from their dealerships and reduce their gross earnings.

These concerns prompted a proposal that the area dealership owners meet to discuss the development of the Mall. A group of eight individuals representing nine automobile dealerships, including RWM/Moore,[3] most of whom were located in close proximity to each other about ten miles from the proposed ESD project site, attended the first meeting which occurred on March 31, 1989. An attorney in attendance at the request of one of the meeting participants advised the dealers that they must proceed with caution, couching their opposition so as not to appear to be acting in concert.

Each dealer in attendance operated under franchise agreements which provided procedures for objecting to the placement of a same-line dealership within their market area and required manufacturers or franchisors to give due consideration to any such objections. RWM/Moore's franchise agreements, for example, required the respective manufacturers to notify them of their intention to establish or relocate a same-line franchise within twenty miles of the RWM/Moore dealerships. RWM/Moore then had thirty days to submit objections to the establishment of such a franchise. Franchisees also possessed the right to appeal manufacturer decisions to place a new franchise within eight miles of appellants' dealerships. The full exercise of these contractual rights had the potential of delaying a manufacturer's decision to award a new franchise by several months.

The dealership owners at the meeting agreed that they should exercise their contractual rights of protest in connection with plans for the Mall. However, despite advice counseling against activities which would create an appearance of concerted action, the dealers also agreed to jointly retain the attorney in attendance to represent them in their opposition efforts. Further, with the aid of counsel, the dealers proceeded to discuss a possible name for their group, a proposed statement of purpose, and the value of jointly commissioning a market study. They concluded the meeting by instructing their attorney to draft (1) a form letter protesting the possible placement of a same-line dealership in the Mall which each dealer could send to its respective manufacturer and (2) a group statement of purpose.

The dealers held a second meeting on April 6, 1989. At this time, they adopted the name "Dealers Alliance" (Alliance) for their opposition group and named three of the dealers as group representatives. They also reviewed and adopted the group statement of purpose which their attorney had drafted. The statement provided in part:

> The purpose of the Dealers Alliance is to explore and advance areas of common and individual dealer concern with respect to actions of franchisors/manufacturers at the proposed Chesterfield Auto Mall, or any similar geographic location.... The goal of the Dealer Alliance is to investigate and provide facts and evidence to its members and to the automobile manufacturers concerning the potential impact of the foregoing upon ex-

---

**3.** Appellants RWM and Moore Automotive are each owned and operated by Ron Moore (Moore), who attended the meeting in his capacity as president of both corporations. At least one other dealership owner attended, but departed upon determining that the group planned to conduct an opposition campaign.

isting automobile dealers. The Dealer Alliance seeks to enable the members and the manufacturers to make informed decisions regarding potential new or relocated dealerships. The further goal of the Dealer Alliance is to insure that the legal rights of its individual members are protected.

Additionally, the members of the Alliance agreed to jointly commission a market study which each member could use to counter the market studies of their respective manufacturers and as evidence in any possible lawsuit against a manufacturer for breach of good faith in complying with the terms of the franchise agreement. The attorney for the Alliance also requested that each member complete a questionnaire. The questionnaire, labeled "Privileged and confidential—prepared in anticipation of litigation," requested that each dealer provide the attorney with a copy of his franchise agreement and any information he possessed regarding, *inter alia*, market studies performed by his respective manufacturer, oral representations by his manufacturer concerning the establishment of new dealerships in the area, and the dealers' relevant market area.

Finally, prior to the April 6 meeting, each of the members received the form letter of protest drafted by the group's attorney. The form letter stated in part:

A development known as the Chesterfield Auto Mall is seeking dealers to open new or relocated franchises.... My concern is focused on your action or potential action with respect to locating a dealership in this market area at or near this geographical point.... As you know, [Manufacturer/Franchisor] is under legal obligation, imposed by both U.S. and Missouri law, to deal with me in good faith. I trust that [Manufacturer/Franchisor] will not act arbitrarily, capriciously, or in bad faith when presented with a request for a new or relocated franchise in connection with the Mall and will keep my legitimate franchise interests in mind.

Most, if not all, of the dealers sent letters substantially identical to the form letter to their respective manufacturers.

Plaintiffs have been unable to conduct further negotiations with the manufacturers concerning the placement of franchises in the Mall since the mailing of the letters. More particularly, representatives from Ford, who had expressed a strong interest in placing a franchise in the Mall, terminated discussions regarding both the placement of a new dealership in the Mall and the possibility of awarding that franchise to Sapot. Representatives from Oldsmobile and Cadillac also declined to proceed with negotiations. The Cadillac zone manager expressly aired his concern that placement of a new dealership in the Mall might spur litigation with RWM/Moore owner and president Ron Moore who had already filed an unrelated action against Cadillac for its awarding of a franchise in another market area. Indeed, many of the withdrawing manufacturers made specific reference to letters they had received from their respective Alliance franchisees.

ESD and Sapot consequently filed the present action on October 3, 1989 seeking to enjoin the nine participating Alliance dealers from continuing their concerted activities in opposition to the development of the Mall. Plaintiffs asserted that the activities of the Alliance constituted a violation of § 1 of the Sherman Act which makes illegal "[e]very contract, combination ..., or conspiracy in restraint of trade." 15 U.S.C. § 1.

Seven of the nine dealers entered into separate settlement agreements with plaintiffs just prior to the scheduled hearing for permanent injunction. The seven dealers variously agreed to pay undisclosed sums of money and agreed not to oppose the development of the Mall for a period of two years. Moore opted to defend the case brought against his two dealerships. After conducting a hearing on October 23, 1989, the district court concluded that the Alliance constituted an illegal combination and conspiracy engaged in a horizontal nonprice restraint which it declared a *per se* violation of § 1 of the Sherman Act.

The district court consequently granted injunctive relief pursuant to § 16 of the

Clayton Act, 15 U.S.C. § 26. In its order dated December 27, 1989, the district court enjoined appellants from:

> (1) engaging in any form of individual activity, joint activity or coordinated action with any third parties concerning the development, construction or operation of the Chesterfield Auto Mall;

> (2) engaging in any form of joint activity or coordinated action with any third parties concerning the granting of one or more automobile franchises to the Chesterfield Auto Mall;

> (3) communicating with or responding to communications from any automobile franchisor or manufacturer ... concerning the Chesterfield Auto Mall, or the award ... or the relocation of an automobile franchise or dealership in the Chesterfield Auto Mall.

*ES Development, Inc. v. RWM Enterprises, Inc.,* No. 89–1867–C–5 (E.D. Mo. Order of Dec. 27, 1989).

The district court, again pursuant to 15 U.S.C. § 26, also awarded costs and reasonable attorney's fees to plaintiffs as prevailing parties. Plaintiffs accordingly submitted documentation in support of a request for $52,933.50 in fees. In its order of April 11, 1990, the district court stated that plaintiffs had submitted a reasonable figure for the fees generated in the original suit filed against all nine dealers in the Alliance. The district court concluded, however, that fairness dictated that the two remaining defendants, RWM/Moore, not bear the cost of the suit against all nine original defendants. It accordingly awarded plaintiffs 25% of the fees and costs which they requested.

This appeal followed in which RWM/Moore contend that the activities of the members of the Alliance did not violate the Sherman Act and that the district court's order of injunctive relief is overbroad. Plaintiffs ESD and Sapot cross appeal on the issue of the district court's decision to award 25% of the total fees and costs incurred in its action below.

## II. DISCUSSION

### A. Sherman Act Liability

Appellants contend that the formation and activities of the Alliance and its members are insufficient to give rise to § 1 Sherman Act liability. The essence of a § 1 Sherman Act violation is a contract, combination or conspiracy which unduly restrains trade. *Pumps & Power Co. v. Southern States Indus., Inc.,* 787 F.2d 1252, 1256 (8th Cir.1986); *Eastern States Retail Lumber Dealers Ass'n v. United States,* 234 U.S. 600, 609, 34 S.Ct. 951, 953, 58 L.Ed. 1490 (1914); 15 U.S.C. § 1. Appellants specifically assert that the underlying facts do not support the district court's finding of a contract, combination or conspiracy. They suggest that the group's activities constituted no more than the exercise of the constitutional, statutory and contractual rights of each member to express legitimate self-interested concerns regarding their financial well-being. We reject these assertions.

#### 1. *Combination or Conspiracy*

■ As an initial matter, a finding of a § 1 violation requires a finding of a contract, combination or conspiracy. *International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255, 1265 (8th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980). However, the simple fact of a conspiracy or combination will not alone support Sherman Act liability. The evidence must also establish that the alleged participants combined or conspired to "achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984).

■ Proof of such a combination or conspiracy does not depend upon the existence of a formal agreement. *Reed Bros., Inc. v. Monsanto Co.,* 525 F.2d 486, 495 (8th Cir.1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976). Indeed, it is axiomatic that the typical conspiracy is "rarely evidenced by explicit agreements," but must almost always be proved by "inferences that may be drawn from the behavior of the alleged conspira-

tors." *H.L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir.1981) (quoting *Michelman v. Clark–Schwibel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976)), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). Thus, an antitrust plaintiff may prove the existence of a combination or conspiracy by providing either direct or circumstantial evidence sufficient to "warrant a ... finding that the conspirators had a unity of purpose or common design and understanding, or a meeting of the minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) *quoted in H.L. Moore Drug*, 662 F.2d at 941; *see also Cheatham's Furniture Co. v. La–Z–Boy Chair Co.*, 728 F.Supp. 569, 571 (E.D.Mo.1989), *aff'd*, 923 F.2d 858 (8th Cir.1990); *cf. Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

■ We agree with the district court that evidence exists to support the conclusion that the dealers, including appellants, entered into a combination or conspiracy in restraint of trade. The dealers met on two occasions for the express purpose of discussing the possible entry of a competitor who might attract their clientele and diminish their profitability. At their second meeting, the dealers agreed to undertake action to frustrate the plans of their prospective competitor, gave a name to their opposition group, and agreed to a statement of purpose. The members of the Alliance further agreed to jointly retain an attorney who provided advice on legal tactics in presenting objections to their respective manufacturers. The group's attorney also drafted a form letter of objection which most of the Alliance members (including appellants) sent to the manufacturers. The members further agreed to jointly fund a market study to be used as an offensive tool against the manufacturers in the event of a lawsuit.

Appellants do not contest the fact that they participated in these activities. However, they do take issue with the district court's legal characterization of them. They particularly assert that the dealers met for the sole purpose of protecting their individual rights under their respective franchise agreements. Appellants further assert that the dealers' meeting was motivated merely by concern over the placement of same-line dealerships in the Mall, a matter within the legitimate scope of the individual franchise agreements.

The evidence supports the district court's determination that the dealers' motivation extended to a concern well beyond the legitimate scope of the individual contractual rights of protest provided under the franchise agreements; that is, concern regarding the very existence of the Mall, regardless of the type of automobile lines which might be sold there. The concept behind the Mall was, in part, to provide automobile consumers with the convenience of one-stop shopping. Additionally, the Mall concept apparently would permit participating dealers to lower their operating costs and margins by sharing service facilities, thus allowing them to compete more effectively.[4] These features, which would inhere in the Mall itself, rather than in the placement of any particular type of franchise line in the Mall, created the potential for reducing floor traffic and thus sales and profitability of the Alliance members' dealerships.

■ Appellants also contend that the members of the Alliance did no more than independently exercise individual legal rights. It is true that the Sherman Act does not impart liability for actions by an individual, regardless of their anticompetitive motive or effect, unless the individual entity possesses monopoly power. *See, e.g., Pumps & Power Co.*, 787 F.2d at 1256. The evidence here, however, compels the inference that the dealers chose to exercise their individual legal rights in a concerted manner designed to impair plaintiffs' abili-

4. This underlying business rationale was evidenced by plaintiffs' testimony stating that the project was not feasible without a threshold number of franchise commitments from manufacturers. Without the requisite number of commitments, plaintiffs testified that they would not exercise their options to purchase the land at the proposed Mall site.

ty to procure franchise commitments from various manufacturers.

Furthermore, while we do not question the legality of appellants' separately filed protests, "[a]cts which may be legal and innocent in themselves, standing alone, lose that character when incorporated into a conspiracy to restrain trade." *Kurek v. Pleasure Driveway & Park Dist.*, 557 F.2d 580, 587 (7th Cir.1977), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979); *see Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 468–69, 82 S.Ct. 486, 488–89, 7 L.Ed.2d 458 (1962) (exercise of individual and legal contract rights run afoul of Sherman Act where done so as "part and parcel of unlawful conduct with others or ... conceived in a purpose to restrain trade, control a market, or monopolize."); *Simpson v. Union Oil Co.*, 377 U.S. 13, 21, 84 S.Ct. 1051, 1057, 12 L.Ed.2d 98 (1964) (undertaking of otherwise legal arrangement unlawful when exercised to advance illegal antitrust purpose). Thus, the otherwise legal nature of appellants' activities in furtherance of their conspiracy do not shield them from antitrust liability.

The present case provides a further example of the antitrust maxim that "even an otherwise lawful device may be used as a weapon in restraint of trade." *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 119, 68 S.Ct. 947, 952, 92 L.Ed. 1245 (1948). As noted above, the success of plaintiffs' project depended upon the acquisition of multiple manufacturer commitments to place franchises in the Mall. However, the lawful franchise agreements bound the manufacturers to consider the objections of same-line dealers within a certain distance of the Mall. An objection could delay a manufacturer's decision for months or longer, particularly in the event of a lawsuit by a franchisee.

Plaintiffs' ultimate success, of course, did not hinge upon the decision of any one manufacturer. However, the concerted exercise of legal contractual rights by Alliance members simultaneously precluded numerous manufacturers from making a commitment to the Mall during the crucial period when the clock was running on plaintiffs' options to purchase the land at the project site. Beyond any effort to simply exercise their legal right to bring their franchise placement objections to the attention of the manufacturers, the concerted exercise of such rights by the members of the Alliance appears to have been designed to dissuade plaintiffs from exercising their options on the land, a result which no dealer could have brought about acting alone.

Moreover, by concertedly exercising their independent contract rights to block plaintiffs' access to the manufacturers, the Alliance, in effect, exercised a sort of veto over the entry of a new competitor to the market. We have previously suggested, albeit in a different context, that the exercise of veto power over a new franchise application by horizontal competitors constitutes a patently unreasonable restraint of trade. *See Quality Mercury, Inc. v. Ford Motor Co.*, 542 F.2d 466, 470–71 (8th Cir.1976), *cert. denied*, 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977).[5] Again, no dealer would have been able to bring about such a result acting alone. Furthermore, although the dealers merely coordinated the simultaneous exercise of legitimate contract rights, their motivations clearly exceeded the scope of concerns for which the protest provisions of the franchise agreements were designed. In sum, the antitrust laws do not countenance such a concerted individual exercise of the otherwise legal rights of the members of a conspiracy to achieve a combined effect in restraint of trade in excess of that possible

---

5. *Quality Mercury* involved an exclusive franchise agreement between an automobile manufacturer and a single franchisee which effectively gave the latter a veto over the manufacturer's decision to locate a new same-line franchise in the relevant market. As such, the case involved merely a vertical agreement in restraint of trade, an arrangement which inspires a significantly lower level of opprobrium than horizon-tal agreements. *Id.* at 470–71 & n. 5; *see Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). The present case presents us with a stronger basis for condemning an effective veto over franchise decisions because, unlike *Quality Mercury*, we are presented with an agreement among numerous horizontal competitors. *See infra*, § A.2.

were the conspirators to act alone. *See United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

■ Appellants also attempt to clothe the actions of the Alliance and its members in the garb of protected first amendment commercial speech. However, it is well-established that the exercise of such rights as an integral part of an illegal conspiracy will not shield the conspirators from antitrust liability. *See, e.g., California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513–14, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972). Here, the Alliance members combined and conspired to concertedly exercise their constitutionally protected rights of commercial speech to block the entry of a new competitor into their market. Thus, we conclude that the district court properly rejected appellants' constitutional arguments. We therefore affirm the district court's finding of a combination or conspiracy in restraint of trade.

### 2. *Unreasonable Restraint of Trade*

■ Because all contracts, combinations or agreements among economic actors in some sense restrain trade, *National Collegiate Athletic Assoc. v. Board of Regents*, 468 U.S. 85, 98, 104 S.Ct. 2948, 2958, 82 L.Ed.2d 70 (1984), an antitrust plaintiff must demonstrate that the combination or conspiracy in question resulted in an undue or unreasonable restraint of trade. *See, e.g., Pumps & Power Co.*, 787 F.2d at 1256. The antitrust plaintiff may establish an unreasonable restraint of trade by evidence showing that (1) the conspiracy was of a type that the law finds to be inherently unreasonable (a *per se* violation), or (2) that the conspiracy had an anticompetitive motive or effect (a rule of reason violation). *Overseas Motors, Inc. v. Import Motors Ltd.*, 375 F.Supp. 499, 531 (E.D.Mich.1974), *aff'd*, 519 F.2d 119 (6th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975); *Rosebrough Monument Co. v. Memorial Park Cemetery Assoc.*, 666 F.2d 1130, 1138 (8th Cir.1981), *cert. denied*, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982).

■ The classic form of a *per se* § 1 Sherman Act violation is a combination, conspiracy or agreement between competitors at the same level of the market to restrain competition; the so-called "horizontal" restraint of trade. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972); *Quality Mercury, Inc. v. Ford Motor Co.*, 542 F.2d at 470–71 & n. 5. We affirm the district court's determination that the Alliance constituted a horizontal restraint of trade and thus warrants condemnation as a *per se* violation of the Sherman Act.

Appellants assert that the restraint in question here is not horizontal, but rather a vertical non-price restraint, consisting only of letters sent individually by the dealers to the manufacturers at a higher level in the market structure. If this were so, we would be constrained to analyze the present case under the rule of reason standard which is presumed to apply in vertical non-price restraint cases. *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); *Cheatham's Furniture*, 728 F.Supp. at 571. However, we reject appellants' attempt to recast their activities as part of a vertical non-price restraint.

As we concluded in the previous section, the evidence demonstrates that the opposition campaign arose from an agreement among the nine dealers to take parallel actions to frustrate the entry of a new competitor into the retail market. In this respect, the facial appearance of the Alliance is similar to a combination which the Supreme Court rejected in *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In that case, General Motors attempted to enforce order in its Los Angeles area market when it pressured recalcitrant dealers not to conduct business with discounters. G.M. took this action in response to individually filed complaints from other Los Angeles area G.M. dealers who found that they were being undersold by the discounters.

As in the present case, the individually filed dealer complaints arose from an

agreement among the complaining dealers to concertedly take simultaneous, parallel action in opposition to the practices of their more aggressive competitors. Thus, although General Motors' action on its face seemingly imposed a vertical restraint in response to vertical activity from individual dealers, it came as a result of inducements emanating from a horizontal agreement among the dealers to constrain competitive activity at the same dealer level.

The petitioners in *General Motors* attempted to characterize their activities as vertical in nature, however, the Supreme Court rejected this argument, declared the dealers' activities to be horizontal in nature and condemned them as a *per se* violation of § 1 of the Sherman Act. The Court concluded by stating that "where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation of the underlying conduct." 384 U.S. at 146, 86 S.Ct. at 1331 (citation omitted). Similarly, in the present case, appellants and other dealers acted to frustrate a prospective competitor's access to same-line products by means of a concerted campaign of vertical communications with the manufacturers. The dealers' actions in the present case therefore emanated from a horizontal agreement and thus constitute a *per se* violation of the Sherman Act.

**B. Injunctive Relief**

■■■ Appellants next challenge the propriety of the scope of the district court's order of injunctive relief. They contend that the district court failed to properly balance the equities in fashioning its injunction. More specifically, appellants assert that the portions of the injunction enjoining them from "engaging in any form of individual activity" and individually "communicating with or responding to communications from" their respective manufacturers regarding the Mall or the placement of a franchise in the Mall are overbroad in that they prohibit them from exercising their constitutionally protected rights of commercial speech. We conclude that the district court has the authority to impose certain restrictions upon the commercial speech of individual entities which have violated the Sherman Act. However, we believe that the district court's failure to limit the duration of its restraint against appellants' individual exercise of commercial speech renders the relief overbroad, particularly in light of its constitutional ramifications.

■■■ Upon finding an antitrust defendant guilty of a violation of the Sherman Act, a district court is "empowered to fashion appropriate restraints on [the defendant's] future activities both to avoid a recurrence of the violation and to eliminate its consequences." *National Soc. of Professional Engineers v. United States*, 435 U.S. 679, 697, 98 S.Ct. 1355, 1368, 55 L.Ed.2d 637 (1978). In fashioning a remedy, a district court should endeavor to ensure that the conspirators "so far as practicable, [are] denied future benefits from their forbidden conduct." *United States v. United States Gypsum Co.*, 340 U.S. 76, 89, 71 S.Ct. 160, 169, 95 L.Ed. 89 (1950). Thus, the district court may consider both the "continuing effects of past illegal conduct," *Wilk v. American Medical Ass'n*, 671 F.Supp. 1465, 1485 (N.D.Ill.1987), *aff'd*, 895 F.2d 352 (7th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990); *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 236 (9th Cir.1976), and the possibility of "lingering efforts" by the conspirators to capitalize on the benefits of their past illegal conduct. *Wilk*, 671 F.Supp. at 1484; *see International Salt Co. v. United States*, 332 U.S. 392, 400–01, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947).

■■■ In the present case, appellants clearly could continue to reap the benefits of their past illegal conduct as members of the Alliance if left free to individually pursue their objections to the development of, and the placement of franchises in, the Mall. Appellants object to the injunction as a restraint upon their constitutional rights of commercial speech. We agree with this characterization of the impact of

**558**

the injunction in the present case,[6] however, "[i]t is well-settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute."[7] *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513–14, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972); *see also National Soc. of Professional Engineers*, 435 U.S. at 697–98, 98 S.Ct. at 1368. Thus, while we agree that the resulting order may curtail appellants in the exercise of liberties that they might otherwise enjoy, we believe that is a "necessary and ... unavoidable consequence of the[ir] violation" of the antitrust laws. *National Soc. of Professional Engineers*, 435 U.S. at 697, 98 S.Ct. at 1368.[8]

■■■■■ Although we affirm the district court's decision to impose a form of relief which hinders appellants in the exercise of their rights of commercial speech, we are constrained to observe that the district court's broad equitable powers are not without limit. Indeed, the district court is limited by the requirement that it "model [its] judgment[ ] to fit the exigencies of the particular case." *International Salt Co. v. United States*, 332 U.S. at 400–01, 68 S.Ct. at 17. A proper tailoring of relief to the exigencies of a particular case is espe-

cially important in cases such as the present one, in which the relief granted necessarily carries constitutional ramifications. Moreover, it is well-established that limitations upon commercial speech must be "narrowly drawn[,] ... extend[ing] only as far as the interest it serves." *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 565, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980) (citation omitted).

In the present case, the district court's order enjoins appellants from individually communicating with their respective manufacturers concerning the Mall for the indefinite future. While a limitation upon such activities is necessary to prevent appellants from both reaping and perpetuating the benefits of their past illegal conduct, the continuing effects of the conspiracy are certain to recede with time. Thus, we believe that the district court's open-ended restriction upon appellants' individual exercise of their constitutionally protected rights of commercial speech is inappropriate under the present circumstances.

The district court noted that the seven original defendants who chose to settle plaintiffs' claims against them prior to trial agreed not to oppose the development of

---

**6.** Appellants' individual communication with their respective manufacturers clearly is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980). Thus, we agree that the district court's order restrains appellants in the exercise of their rights of commercial speech which are protected under the First Amendment. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

**7.** This is particularly true in cases involving commercial speech, because although it is constitutionally privileged, the "Constitution accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson*, 447 U.S. at 562–63, 100 S.Ct. at 2350 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456–57, 98 S.Ct. 1912, 1919, 56 L.Ed.2d 444 (1978)).

**8.** In upholding an order restricting the range of expression that a professional association could

make regarding the ethics of competitive bidding, the Court in *National Soc. of Professional Engineers* observed that injunctions against price-fixing, one of the more egregious violations under the Sherman Act, abridge the freedom of businessmen to communicate with one another about prices. 435 U.S. at 679, 98 S.Ct. at 1355. In making this observation, the Court suggested that even the most basic forms of equitable relief under the Sherman Act necessarily involve some type of restriction against the first amendment protected right of commercial speech. Thus, responding to the petitioner's objections to the district court's injunction on First Amendment grounds, the Court observed that "the first amendment does not 'make it ... impossible ever to enforce laws against agreements in restraint of trade....'" 435 U.S. at 697, 98 S.Ct. at 1368 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 690, 93 L.Ed. 834 (1949)). Similarly, in the present case, appellants' argument proves too much insofar as it would invalidate much of the antitrust relief upheld by the Supreme Court over the past century and render effective enforcement of the antitrust laws all but impossible.

the Mall for a period of two years. Plaintiffs' agreement to this term of relief suggests to us some measure of what plaintiffs themselves deemed reasonable under the circumstances.[9] We therefore remand to the district court for the limited purpose of modifying the injunction by placing a reasonable time limit upon its prohibition against appellants' individual exercise of their rights of commercial speech concerning the Chesterfield Auto Mall. We suggest in light of the record before us that such a limitation probably ought not to exceed three years, but leave such period subject to further determinations by the district court.

### C. Attorney Fees

 ESD and Sapot counterappeal on the issue of the district court's award of fees and costs. They assert error in the fact that the district court awarded only 25% of what it had expressly deemed to be reasonable fees and costs for the case. After reviewing plaintiffs' documentation, the district court stated that plaintiffs' request for $52,933.50 constituted a reasonable figure for the fees incurred in the original suit filed against all nine dealers in the Alliance.[10] It concluded, however, that fairness dictated that RWM/Moore not bear the legal expenses of the suit against all nine original defendants. It accordingly awarded plaintiffs 25% of the requested fees and costs, roughly appellants' *pro rata* responsibility for the total fees as against all of the original defendants. Plaintiffs now assert that the district court failed to properly consider its contention that they would have had to incur approximately the same fees and costs even if they had originally filed suit against only the two defendants who proceeded to trial rather than all nine participants in the conspiracy.

 "The district court is vested with significant discretion in determining a reasonable fee." *Paschall v. Kansas City*

*Star Co.,* 695 F.2d 322, 337 (8th Cir.1982) (citing *International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255, 1274 (8th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980)), *rev'd on other grounds on reh'g,* 727 F.2d 692 (8th Cir.1984); *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 776 F.2d 646, 650 (7th Cir.1985). We review the factual basis for an award of attorney's fees in an antitrust action under a clearly erroneous standard and a district court's determination of the amount of a fee award under an abuse of discretion standard. *Id.; cf. H.J., Inc. v. Flygt Corp.,* 925 F.2d 257 (8th Cir.1991) (same standard of review applies to fee award for successful antitrust damages claimant); *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (same standard of review applies to fees awarded under 42 U.S.C. § 1988).

The district court was made aware of the fact that the settling defendants agreed to pay an undisclosed sum of money as part of their settlement. At oral arguments before this court, however, plaintiffs were unable to state with certainty whether they ever informed the district court of the precise amount of money the settling defendants agreed to pay. Under these circumstances, we believe that it fell within the discretion of the district court to decide that fairness dictated that appellants be held responsible for no more than their approximate *pro rata* share of the total fees and costs. We therefore affirm the district court's award of 25% fees and costs.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's finding of Sherman Act liability against appellants and its award of fees and costs. We remand this case to the district court, however, for the limited purpose of modifying the injunction by placing a reasonable time limit upon its restriction against appellants' individual exercise of

---

**9.** We recognize that plaintiffs' relief should not necessarily be limited to the two-year term of relief arrived at through compromise and settlement with the other parties.

**10.** It modified plaintiffs' cost documentation to arrive at a figure of $3,899.06 in the action as originally filed against all nine members of the Alliance.

their rights of commercial speech concerning the Chesterfield Auto Mall.

Appellees are entitled to 50% of their costs on appeal.