**McCABE'S FURNITURE, INC., Appellee,**

v.

**LA–Z–BOY CHAIR CO., Appellant.**

No. 85–1825.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 16, 1986.

Decided Aug. 13, 1986.

---

Peter G. Kumpe, Little Rock, Ark., for appellant.

Merl O. Barnes, San Francisco, Cal., for appellee.

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and MURPHY,* District Judge.

JOHN R. GIBSON, Circuit Judge.

La-Z-Boy Chair Company, a manufacturer, appeals from a jury verdict awarding $90,000 in treble damage to McCabe's Furniture, a terminated dealer. The jury

found that La-Z-Boy had conspired with Cyrus Opferman, owner of a La-Z-Boy Showcase Shoppe competing with McCabe's, to maintain resale prices, a per se violation of section one of the Sherman Act, 15 U.S.C. § 1 et seq. (1982). La-Z-Boy appeals the district court's denial of its motion for judgment notwithstanding the verdict, arguing that McCabe's presented insufficient evidence of a vertical price maintenance conspiracy under the standard set forth by the Supreme Court in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). La-Z-Boy also claims that the jury was not properly instructed and that the damage award was excessive. We conclude that McCabe's produced sufficient evidence that La-Z-Boy and Opferman conspired, but failed to produce sufficient evidence that they conspired to maintain the price of La-Z-Boy products in the Little Rock market, the basis upon which McCabe's pleaded and presented its case. Therefore, we reverse the judgment of the district court.

La-Z-Boy manufactures furniture and distributes its products throughout the United States in two ways. Some of La-Z-Boy's sales are made through La-Z-Boy Showcase Shoppes, independently owned and operated retail outlets which exclusively sell La-Z-Boy products. Showcase Shoppe owners agree to advertise, to maintain an outlet with certain point-of-purchase amenities, and to offer repair service. In exchange for providing these services, Showcase Shoppe owners are licensed to use the La-Z-Boy name. La-Z-Boy also deals with department stores and retail furniture stores. These independent dealers carry a variety of furniture brands and make no contract to promote or service the La-Z-Boy line.

McCabe's Furniture is one of about a half-dozen independent retail furniture stores selling La-Z-Boy products in Little Rock, Arkansas. Until February 1984,

* The HONORABLE DIANA E. MURPHY, United States District Judge for the District of Minnesota, sitting by designation.

when La-Z-Boy terminated the relationship, McCabe's had been dealing with La-Z-Boy for approximately 15 years. Fred McCabe, owner of McCabe's, testified that his marketing approach consistently had been to contain overhead costs and pass the savings to consumers in the form of low prices. McCabe testified that, despite his discounting, La-Z-Boy had never threatened termination, although it had occasionally urged him to raise his prices. La-Z-Boy concedes that it suggests retail prices to all its dealers, but claims to make no effort to police those prices. The evidence confirms that some Showcase Shoppes sell below La-Z-Boy's suggested retail price.

La-Z-Boy also distributes in Little Rock through a La-Z-Boy Showcase Shoppe, owned and operated by Cyrus Opferman. Operfman opened the first Little Rock Showcase Shoppe in 1978, and opened a second, in North Little Rock, in 1981. Until the termination, McCabe's Furniture and Opferman's Showcase Shoppes were competitors on the La-Z-Boy line.

In 1982, faced with a decline in sales, Opferman began complaining to La-Z-Boy representatives about competing dealers, principally McCabe's and Crafton's, another independent dealer some 18 miles outside Little Rock. Opferman testified that he complained that his competitors did not advertise the La-Z-Boy product, that their display of the product tarnished the La-Z-Boy image, and that they provided no repair service. He objected to the competitors' freeriding on his expenditures and efforts. He also complained that their prices were too low, and that their low prices were cutting into his sales. Opferman testified that he voiced these complaints frequently and continually until he learned from La-Z-Boy of McCabe's termination. He added, however, that upon lodging these complaints, he had never received any kind of assent from La-Z-Boy to take action against McCabe's.

On November 4, 1983, Paul Wright, La-Z-Boy's sales manager for the region including Arkansas, wrote a memorandum to Wayne Jacobs, La-Z-Boy's Arkansas factory representative. The memo explained that Opferman would be closing both his Showcase Shoppes and relocating in a single new Shoppe in Little Rock, and that he deserved "to have every break possible to make this new Shoppe successful." Jacobs was instructed "to look carefully at the distribution in Little Rock to make sure that the accounts there will allow Cy to make a decent profit on our product line. The two accounts that come to mind that have caused Cy problems in the past," Wright's memo concluded, "are McCabe's Furniture and Crafton's Furniture." This memo also was sent to Patrick Norton, senior vice president of sales for La-Z-Boy, and Kurt Darrow, who later replaced Wright as sales manager for the region including Arkansas.

The decision to terminate McCabe's ultimately was made by Norton. Norton testified that when he joined La-Z-Boy in 1981, its sales throughout the nation were declining. He believed that the decline stemmed from La-Z-Boy's decreased ability to attract the consumer willing to spend the extra money to buy La-Z-Boy's comparatively expensive product. Norton reasoned that La-Z-Boy could most effectively improve its market position through nonprice competition with lower priced brands. He thus instituted a nationwide program to upgrade the retail promotion and service of La-Z-Boy furniture. This strategy, according to Norton, had succeeded in recapturing for La-Z-Boy a larger share of the furniture market.

Aware that despite nationwide sales growth, Little Rock sales continued to slip, Norton sent Kurt Darrow to inspect the Little Rock retail outlets. Darrow testified that he visited current and prospective La-Z-Boy dealers. Darrow was driven to McCabe's by Opferman, and anonymously inspected the store while Opferman waited outside. He testified, however, as did Opferman, that the two did not discuss the purpose of Darrow's visit. Darrow reported to Norton, in a memo dated of January 24, 1984, that McCabe's was a "very low end store" that was "preventing [La-Z-Boy]

from developing other quality distribution in the Little Rock market." Darrow's memo further advised that McCabe's "should be closed prior to moving the Showcase Shoppe." Norton testified that based on Darrow's observations, and on his experience with the nationwide program, he decided that the best way to support Opferman's promotional and service efforts, and to enhance La-Z-Boy's attractiveness to prospective high-end independent retailers in Little Rock, was to terminate La-Z-Boy's dealings with McCabe's.

When McCabe was informed by letter from Norton of the termination, he phoned Wayne Jacobs to ask why he had been terminated. McCabe testified that "the only reason [Jacobs] could figure out that they were terminating me is to give the La-Z-Boy Shoppe some relief." Opferman testified that he did not learn of McCabe's termination until Paul Wright informed him by telephone in March 1984. According to Opferman, Wright reported McCabe's termination by saying, " 'that problem had been taken care of.' " Finally, Darrow testified that although La-Z-Boy had sought to replace McCabe's with a more upscale retail outlet, an intention he expressed in the memo to Norton, and in a second memo several months later, at the time of trial, 15 months after the McCabe's dealership was terminated, no new dealer had been obtained.

After a one day trial, the jury returned a verdict against La-Z-Boy for $30,000. La-Z-Boy moved for a judgment notwithstanding the verdict on the ground that the evidence was not sufficient for a reasonable jury to find the existence of a vertical price conspiracy between La-Z-Boy and Opferman which resulted in McCabe's termination. The district court denied the motion and ordered the award trebled to $90,000. This appeal followed.

■ In reviewing the denial of a motion for judgment notwithstanding a jury verdict, we must view the evidence and all reasonable inferences in the light most favorable to the party who prevailed before the jury. *Pumps & Power Co. v. South-*

*ern States Industries,* 787 F.2d 1252, 1258 (8th Cir.1986); *Giordano v. Lee,* 434 F.2d 1227, 1231 (8th Cir.1970), *cert. denied,* 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971). In so doing, we

(1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tends to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*Dace v. ACF Industries, Inc.,* 722 F.2d 374, 375 (8th Cir.1983), modified per curiam, 728 F.2d 976 (8th Cir.1984). In addition, we observe that the Supreme Court has urged the lower courts, when adjudicating claims of insufficient evidence in antitrust cases, to evaluate the evidence as a whole, and to refrain from "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962); *see also Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (emphasizing that in antitrust cases, motive and intent are important issues).

■ In *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), a dealer termination case like this one, the Supreme Court set forth the evidentiary requirements to create a jury issue as to the existence of a vertical conspiracy. The Court held that proof that a manufacturer terminated plaintiff's dealership following, or even in response to, complaints by competing dealers, is legally insufficient to support a jury finding of concerted action. The Court reasoned that a manufacturer and dealer have many legitimate reasons for exchanging information about marketing activities; to impose liability because a manufacturer acted on information originating as a dealer complaint, or based on other "highly ambiguous evidence," would deter commer-

cially useful communications. *Id.* at 763–64, 104 S.Ct. at 1470–71. The Court thus ruled that to get to the jury, "something more * * * is needed." *Id.* at 764, 104 S.Ct. at 1471. The plaintiff must present direct or circumstantial evidence that "reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). "There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.* The Supreme Court recently emphasized this aspect of the *Monsanto* standard in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), stating that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 1357.

The evidence is undisputed that from 1982, Opferman continually complained to La-Z-Boy that McCabe's various marketing practices were hurting his sales. It is further undisputed that following Opferman's complaints, La-Z-Boy terminated McCabe's dealership. Indeed, Wright's memorandum to Jacobs concerning the "problems" which McCabe's posed to Opferman, also sent to Norton and Darrow, and Norton's instruction to Darrow to investigate the Little Rock market, reasonably raise the possibility that the termination came in response to Opferman's complaints. This evidence alone, however, is insufficient to support a jury finding of concerted action. The question is, is there "something more?" *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471.

■ We believe the record reveals additional circumstances from which jurors reasonably could find that La-Z-Boy and Opferman shared the "conscious commitment to a common scheme," *id.*, required to satisfy the *Monsanto* standard. We are most impressed by the evidence that, after McCabe was terminated, Wright reported to Opferman that "'the problem had been taken care of.'" A jury reasonably could conclude that this communication, combined with McCabe's testimony that "the only reason [Jacobs] could figure out that they were terminating me is to give the La-Z-Boy Shoppe some relief," tended to exclude the possibility that La-Z-Boy and Opferman were acting independently. *See id.* at 767, 104 S.Ct. at 1472 (relying on post-termination statements by manufacturer to conclude that plaintiff's termination was pursuant to an agreement between manufacturer and dealers). In addition, the fact that Darrow, upon arriving in Little Rock, was taken to McCabe's by Opferman, despite Darrow's and Opferman's testimony that they discussed nothing, is an event which a jury reasonably could view as evidence of concerted action. *See Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 473 (3d Cir.1985) (evidence of an opportunity to conspire, while not alone enough to sustain an antitrust plaintiff's burden, is relevant) (citing *Edward J. Sweeney & Sons, Inc.*, 637 F.2d at 115).

■ We conclude that McCabe's presented sufficient evidence to support the jury's determination that La-Z-Boy and Opferman did not act independently. That the evidence of concerted action is primarily circumstantial does not undermine this conclusion: conspiracies are rarely evidenced by explicit agreements, and therefore may be proved by circumstantial evidence and the reasonable inferences that may be drawn therefrom. *See Westborough Mall, Inc. v. City of Cape Girardeau*, 693 F.2d 733, 743 (8th Cir.1982); *see also Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471. Nor do we believe the jury's determination is based on "highly ambiguous evidence." *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470. To the contrary, viewing the entire record in the light most favorable to the jury's verdict, that is, assuming as true all facts and inferences reasonably supported by the testimonial and documentary evidence, we believe that the jury finding of concerted action, pursuant to which

McCabe's was terminated, was not unreasonable.

■ Our inquiry, however, cannot end here. To hold La-Z-Boy liable, the conspiracy it engaged in with Opferman must have been designed to achieve an illegal purpose. *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471. With regard to illegality, antitrust law distinguishes conspiracies to maintain resale prices from conspiracies to impose vertical nonprice restrictions. *Id.* at 760–61, 104 S.Ct. at 1469. A concerted refusal to deal to maintain resale prices is illegal per se. *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). Concerted action to impose vertical nonprice restrictions, on the other hand, is subject to the rule of reason, illegal only if unreasonably restraining competition in the relevant market. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Because of this distinction, as post-*Monsanto* authority recognizes, for a terminated dealer to prevail on its per se claim, the evidence must be sufficient for the jury to determine not merely that the manufacturer and nonterminated dealer conspired, but that they conspired to maintain resale prices. *Business Electronics Corp. v. Sharp Electronics Corp.,* 780 F.2d 1212, 1218 (5th Cir.1986), *petition for cert. filed,* 54 U.S.L.W. 3795 (U.S. May 21, 1986) (No. 85–1910); *Terry's Floor Fashion, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604, 617 (4th Cir.1985) (Winter, C.J., concurring). In this case, the distinction is crucial, since McCabe's neither pleaded a nonprice theory nor presented evidence that the agreement pursuant to which it was terminated unreasonably restrained competition.

■ As the Supreme Court observed, "While these distinctions in theory are reasonably clear, often they are difficult to apply in practice." *Monsanto,* 465 U.S. at 762, 104 S.Ct. at 1470. In the usual case, the conduct of the parties and the economic effect of that conduct is identical. *Id.* Whether the manufacturer and nonterminated dealer conspire to maintain prices, or to impose nonprice restraints, their conduct generally will manifest a hostility toward the terminated plaintiff. Similarly, the economic effect of either type of agreement often will be to reduce intrabrand competition and raise prices. The distinction emphasized in *Monsanto* between per se and rule of reason illegality, therefore, must turn ultimately on motive: on whether the manufacturer and nonterminated dealer conspired to terminate the plaintiff intending to affect price competition, or nonprice competition. When faced with conflicting evidence, the jury must determine whether the nonprice justifications for the termination advanced by the defendant are legitimate, or are mere pretext to disguise a per se illegal agreement with the nonterminated dealer to maintain resale prices. It is the court's duty under *Monsanto* to decide whether sufficient evidence was presented for a jury to make that determination.

■ La-Z-Boy presented substantial evidence that its concern with McCabe's stemmed not from its low prices, but from its failure to merchandize the product in a manner consistent with the high quality image La-Z-Boy sought to project. Opferman testified that his discontent with McCabe's and resulting complaints stemmed principally from its failure to advertise and service the La-Z-Boy product. Norton testified that McCabe's failure to advertise, properly display, and service La-Z-Boy furniture tarnished the image which La-Z-Boy sought to foster on a national scale, and discouraged the targeted consumer from purchasing its product. Darrow's memorandum to Norton similarly expressed the concern that McCabe's "very low end store" would discourage higher quality retailers in Little Rock from carrying La-Z-Boy.

Evidence also was presented, however, to support McCabe's charge of a price maintenance conspiracy. The evidence is uncontradicted that Opferman's complaints to La-Z-Boy about McCabe's included complaints about price. In addition, in seeking to address Opferman's complaints, Wright instructed Jacobs to examine Little Rock

distribution to ensure Opferman's ability to "make a decent profit." There was evidence that prior to the termination, La-Z-Boy had urged McCabe's to raise prices, but significantly, no evidence that it similarly had urged McCabe's to advertise, install carpeting in its showroom or otherwise enhance the display of La-Z-Boy furniture, or provide service. Uncontradicted evidence also was presented that La-Z-Boy suggested resale prices. It is clear that La-Z-Boy did not strictly enforce its resale prices, and indeed, that even Opferman sold below the suggested price. Nonetheless, the practice might raise a possibility that La-Z-Boy sought, if not to fix, then at least to stabilize resale prices, which, if achieved through concerted action, is illegal per se. *United States v. General Motors Corp.,* 384 U.S. 127, 147, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966); *Business Electronics Corp. v. Sharp Electronics Corp.,* 780 F.2d at 1218. Finally, it is of some significance that despite La-Z-Boy's claim that the termination was necessary to obtain new upscale accounts in Little Rock, at the time of trial, 15 months after the termination, the McCabe's outlet had not been replaced.

In our view, this evidence viewed as a whole was not sufficient for the jury to reasonably find that La-Z-Boy and Opferman conspired to maintain resale prices. As the Supreme Court cautioned,

> it is precisely in cases in which the manufacturer attempts to further a particular marketing strategy by means of agreements on often costly nonprice restrictions that it will have the most interest in the distributors' resale prices. The manufacturer will often want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesmen or demonstrating the technical features of a product, and will want to see that "free-riders" do not interfere. * * * Thus, the manufacturer's strongly felt concern about resale prices does not necessarily mean that it has done more than the [law] allows.

*Monsanto,* 465 U.S. at 762–63, 104 S.Ct. at 1470 (citations omitted). The evidence demonstrates that La-Z-Boy and Opferman were motivated by a variety of factors, price among them. Indeed, the price concerns which emerge from the record cannot be ignored. There is no question that McCabe's prices were lower than Opferman's, that Opferman frequently complained about McCabe's prices, and that La-Z-Boy urged McCabe's to raise its prices. In addition, La-Z-Boy suggested resale prices to its dealers. Moreover, it can be reasonably inferred from Wright's memo to Jacobs that La-Z-Boy sought to ensure that Opferman would be able to succeed without meeting McCabe's lower prices. This evidence, however, proves no more than La-Z-Boy's "strongly felt concern," *id.* at 763, 104 S.Ct. at 1470, with its dealers' resale prices. The evidence which the jury could have relied upon to discard La-Z-Boy's nonprice justifications as pretextual is precisely the kind of "highly ambiguous evidence," *id.* at 763, 104 S.Ct. at 1470, that *Monsanto* warns must not be considered by the jury. We do not believe it "tends to exclude the possibility that the manufacturer and nonterminated dealer," *id.* at 764, 104 S.Ct. at 1471, were motivated by nonprice concerns in reaching their agreement, as a result of which McCabe's suffered termination. At best it demonstrates "conduct as consistent with permissible competition as with illegal conspiracy." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 106 S.Ct. at 1357. There simply is no evidence that La-Z-Boy's natural price concerns were more than a mere byproduct of the central agreement to maintain legitimate nonprice standards. We thus conclude that the evidence of an agreement between La-Z-Boy and Opferman to maintain resale prices was not sufficient to satisfy the *Monsanto* test and place the resale price maintenance question properly within the province of the jury.

Therefore, we hold that the evidence was insufficient for reasonable jurors to find that La-Z-Boy engaged in a vertical price maintenance conspiracy pursuant to which McCabe's was terminated, in violation of

section one of the Sherman Act. Because we so hold, we need not address La-Z-Boy's additional challenges to the jury instructions and damages award.

The denial by the district court of La-Z-Boy's motion for judgment notwithstanding the verdict is reversed.