_____

No. 94-3380/3496
_____

United HealthCare                         *
Corporation, A                            *
Minnesota Corporation,                    *
                                          *
     Appellee/Cross-Appellant,            *
                                          *
     v.                                   *
                                          *
American Trade Insurance                  *
Company, Ltd.; American                   *
Atlantic Insurance Company,               *
Ltd.; Mitzi Alden King,                   *
individually,                             *
                                          *
     Defendants,                          *
                                          *  Appeal from the United States
Edmund Hugh Benton,                       *  District Court for the District
individually,                             *  of Minnesota.
                                          *
     Appellant/Cross-Appellee,            *
                                          *
Paragon Enterprises, Inc.,                *
an Arizona Corporation,                   *
                                          *
     Defendant,                           *
                                          *
BFT Management, Inc.,                     *
an Oklahoma Corporation,                  *
                                          *
     Appellant/Cross-Appellee,            *
                                          *
Alan Teale,                               *
                                          *
     Defendant.                           *
                                 _____

                 Submitted: January 11, 1996

                    Filed: July 2, 1996
                                 _____

Before BOWMAN, BEAM, and MURPHY, Circuit Judges.
                                 _____

BEAM, Circuit Judge.

Edmund Benton (Benton) appeals from the district court's entry of judgment on a jury verdict awarding United HealthCare Corporation (UHC) damages for Benton's violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (RICO).  Benton argues that UHC was not a real party in interest to the litigation, and that the district court erred in denying his motion for judgment as a matter of law.  Benton also challenges several of the district court's evidentiary rulings and its refusal to submit Benton's proposed special verdict form to the jury.  UHC, in turn, cross appeals the district court's denial of its petition for attorney's fees and costs.  We affirm the judgment on the verdict, but reverse and remand for a determination of costs and attorney's fees.

## I.  BACKGROUND

In the 1980s, Congress responded to a perceived crisis in certain insurance markets by passing the Liability Risk Retention Act, 15 U.S.C. §§ 3901-06 (Act).  The Act loosened previous restrictions on the ability of non-traditional insurers to provide liability insurance through "risk retention groups" and "purchase groups."[1]  Under the Act and its subsequent amendments, risk retention groups and purchase groups are exempt from state laws prohibiting their operation or regulating their membership. 15 U.S.C. §§ 3902 & 3903.

UHC is the parent company of United HealthCare Management Corporation (United HealthCare Management), a management company

---

[1]The Act defines a risk retention group as any corporation or limited liability association chartered or licensed as a liability insurance company under the laws of a state "whose primary activity consists of assuming and spreading all, or any portion, of the liability exposure of its group members."  15 U.S.C. § 3901(a)(4)(A)-(C).  A purchase group includes a group domiciled in any state which "has as one of its purposes the purchase of liability insurance on a group basis." 15 U.S.C. § 3901(a)(5)(A).

which owns and manages a number of Health Maintenance Organizations (HMOs) across the United States.[2] According to its management agreements, United HealthCare Management is responsible for obtaining liability insurance coverage for these HMOs. In 1987, United HealthCare Management sought this coverage from Healing Arts National Association (HANA), a purchase group formed to take advantage of the exemptions provided by the Act. Over the next two years, UHC, through its subsidiary, paid nearly $300,000 in premiums to the HANA program to obtain insurance coverage on behalf of the HMOs it owned or managed.

During the period at issue in this case, HANA insureds were to be covered by master insurance policies provided by either Diversified Insurers Corporation (Diversified) or Victoria Insurance Company (Victoria). After purchasing insurance through HANA for two years, however, UHC discovered that the insurance premiums it had paid had never in fact reached these insurance companies and that the policies purporting to provide insurance coverage were worthless. UHC instigated this lawsuit, naming over 40 individuals and entities as defendants. Originally, UHC focused its litigation efforts on the recovery of costs associated with defending lawsuits brought against one of its HMOs, Physician's Health Plan of Arizona, which was to be insured through the HANA program. By the time of trial, however, UHC had abandoned this course of action and elected, instead, to seek reimbursement of insurance premiums. Most of the defendants either defaulted or settled with UHC, leaving only defendant Benton and one of Benton's corporations, BFT Management, in the litigation at the time of trial.

---

[2]United HealthCare Management operated several HMOs in which it had either a full or partial ownership interest. It also managed HMOs in which it had no financial interest.

At trial, UHC traced the premiums it paid to HANA through various entities, including several owned by Benton. The premiums were initially sent to IMACO, an insurance brokerage company. That company would deduct its commission and forward the remaining premium to Robis International, a re-insurance intermediary. Robis would subtract its commission and wire the premium balance to Comtell, a defendant corporation which began its association with HANA in 1986. Benton was Comtell's vice president and a signator on Comtell's bank accounts. Benton also owned approximately twenty-five percent of Comtell through one of his corporations.

Comtell provided "administrative services" to HANA, and thus was responsible for securing insurance coverage for the HANA members, forwarding premiums to the participating insurers, and issuing insurance certificates. By 1987, however, two other companies, SUMI, Inc. and Purchase Group Management (PGM), were established to assume some of Comtell's responsibilities. Both of these companies were owned and controlled by Benton. With the establishment of these entities, Comtell was no longer responsible for forwarding premiums to the insurance companies. Instead, Comtell transmitted the premiums it received to PGM to forward on to the insurers.

Despite this arrangement, the evidence demonstrated that neither Victoria nor Diversified received premiums from either Comtell or PGM. Financial records and bank statements showed that after the premiums reached Comtell and PGM, approximately $600,000 went into brokerage accounts controlled by Benton, several hundred thousand dollars worth of checks were made out to "cash" and individual defendants, including Benton, and over one million dollars of premium monies disappeared and remain untraceable.

After UHC completed its case, Benton and BFT Management moved for judgment as a matter of law. The court granted the motion as to all counts except UHC's RICO claims, brought under 18 U.S.C.

§ 1962(a)-(d). Benton and BFT Management then presented their defense, claiming that Benton was merely a computer consultant to Comtell and challenging UHC's basic premise that, because none of the premiums reached Victoria and Diversified, UHC's HMOs were never, in fact, insured. After presentation of their defense, Benton and BFT Management renewed their requests for judgment as a matter of law. The district court granted BFT's motion and dismissed it from the case, and granted Benton's motion as to all of UHC's claims except its claim under 18 U.S.C. § 1962(c). The court allowed this claim to go to the jury, and the jury returned a verdict for UHC in the amount of $188,426.80. The court trebled the damage award as required by 18 U.S.C. § 1964(c) and entered judgment in the amount of $565,280.40.

After trial, the district court considered Benton's renewed motion for judgment as a matter of law and UHC's petition for attorney's fees and costs. The district court denied Benton's motion and UHC's request for fees and costs, and both parties appeal.

On appeal, Benton contends that UHC was not a proper party to bring this lawsuit. Benton further argues that judgment as a matter of law should have been granted because UHC failed to establish the elements required to prove a RICO violation under 18 U.S.C. § 1962(c). Finally, Benton contends that the district court abused its discretion in making several of its trial rulings, including: 1) its exclusion of evidence pertaining to the lawsuits brought against Physician's Health Plan of Arizona; 2) its admission of testimony by Charles Huff, investigator for the Georgia Department of Insurance; 3) its admission of testimony by accounting expert Arthur Cobb; 4) its admission of testimony by David Gates, UHC's insurance expert; 5) its admission of assignments of claims executed by HMOs managed by United HealthCare Management; 6) its admission of Comtell's computer records; and 7) its refusal to present Benton's proposed special verdict form to

the jury.  UHC cross appeals the district court's decision denying attorney's fees and costs, arguing that an award of reasonable fees and costs is mandatory under RICO.

## II.  DISCUSSION

### A.    Real Party in Interest

We first address the threshold issue of whether UHC is a real party in interest in this matter.  Rule 17(a) of the Federal Rules of Civil Procedure provides that "[e]very action shall be prosecuted in the name of the real party in interest."  This rule requires that the party who brings an action actually possess, under the substantive law, the right sought to be enforced.  See Iowa Public Service Co. v. Medicine Bow Coal Co., 556 F.2d 400, 404 (8th Cir. 1977).  Such a requirement is in place "to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata."  Fed. R. Civ. P. 17(a), Advisory Committee Note.

Benton argues that UHC is not the real party in interest but is actually asserting claims on behalf of third parties, namely, its subsidiary and the HMOs which its subsidiary owned or managed.  Benton further argues that the assignments of claims obtained by UHC from the non-party HMOs were barred by the statute of limitations and worked unfair surprise upon Benton, who had assumed that UHC would only be seeking to recover the costs of defending lawsuits brought against Physician's Health Plan of Arizona.  UHC argues, in response, that Benton's objection to UHC on real party in interest grounds was untimely and was, therefore, waived. UHC further contends that it has standing as a parent corporation to assert claims of its subsidiaries, and that the assignments of claims are valid.

We agree with UHC that Benton waived his real party in interest defense by failing to raise it in a timely fashion. Because the requirements in Rule 17(a) are for the benefit of the defendant, we have held that an objection on real party in interest grounds "`should be raised with `reasonable promptness' in the trial court proceedings. If not raised in a timely or seasonable fashion, the general rule is that the objection is deemed waived.'" Sun Refining & Marketing Co. v. Goldstein Oil Co., 801 F.2d 343, 345 (8th Cir. 1986) (quoting Chicago & Northwestern Transp. Co. v. Negus-Sweenie, Inc., 549 F.2d 47, 50 (8th Cir. 1977)) (internal citations omitted); see also Audio-Visual Mktg. Corp. v. Omni Corp., 545 F.2d 715 (10th Cir. 1976); Whelan v. Abell, 953 F.2d 663 (D.C. Cir. 1992). In this case, Benton was on notice at least as early as August 1992--nearly two years prior to trial--that UHC might seek reimbursement for the premiums it paid on behalf of the HMOs owned or managed by its subsidiary. Nevertheless, Benton made no objection on real party in interest grounds until the pre-trial conference held only one week before trial.[3] Nor has Benton convincingly demonstrated that he could face double liability from UHC's subsidiary or HMOs. Under these circumstances, we conclude that Benton's objection pursuant to Rule 17(a) comes too late and is therefore waived.[4] See Hefley v. Jones, 687 F.2d 1383 (10th Cir. 1982) (real party in interest defense raised sixteen days prior to trial deemed waived); Whelen, 953 F.2d at 671 (Rule 17(a) defense on the first day of trial deemed waived). Having decided

---

[3]Benton asserts that he raised the Rule 17(a) defense in connection with his Motions for Judgment on the Pleadings and Summary Judgment. We have combed the record, however, and have been unable to locate a reference to this defense until Benton filed a motion in limine on this issue for the pre-trial conference.

[4]Having decided that Benton waived his real party in interest defense, we need not address UHC's argument that a parent corporation may assert the claims of its subsidiaries or decide the effect of the assignments on UHC's real party in interest status.

that UHC may assert its claim against Benton, we proceed to Benton's arguments on the merits.

**B.    RICO Violation**

Benton asserts that UHC failed to present adequate evidence of each of RICO's required elements, and therefore the district court should have granted Benton's motion for judgment as a matter of law.  When reviewing a district court's ruling on a motion for judgment as a matter of law, we consider de novo "whether there is sufficient evidence to support a jury verdict."  White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992).  In so doing, we must "`(1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tends to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.'" Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1221 (8th Cir. 1987), cert. denied, 484 U.S. 1026 (1988) (quoting McCabe's Furniture v. La-Z-Boy Chair Co., 798 F.2d 323, 327 (8th Cir. 1986)).

UHC's surviving RICO claim was predicated on 18 U.S.C. § 1962(c), which states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In order to demonstrate a violation of this section, therefore, a plaintiff must establish (1) the existence of an enterprise; (2) defendant's association with the enterprise; (3) defendant's participation in predicate acts of racketeering; and (4)

defendant's actions constitute a pattern of racketeering activity. <u>See</u>, <u>e.g.</u>, <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985). In addition, the plaintiff must demonstrate that "he has been injured in his business or property by the conduct constituting the violation," <u>id.</u>, a requirement equivalent to a showing of proximate causation and damages. We address each element in turn.

### 1. Enterprise

Benton argues that UHC failed to establish the existence of an "enterprise." Under RICO, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The enterprise must be distinct from the person named as the RICO defendant. <u>See</u> <u>Atlas Pile Driving Co. v. DiCon Fin. Co.</u>, 886 F.2d 986, 995 (8th Cir. 1989). Moreover, the enterprise must be distinct from the alleged pattern of racketeering activity. <u>Id.</u> In other words, as the Supreme Court explained in <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981), an enterprise is not established merely by proof of a series of racketeering acts. Instead, an enterprise must exhibit three characteristics: "(1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering." <u>Atlas Pile</u>, 886 F.2d at 995.

UHC's evidence met these standards. UHC demonstrated that HANA and its affiliated "service" companies, including Comtell, PGM, and SUMI, Inc., operated as a continuing business unit. This association of corporations exhibited continuity in both structure and personnel in its insurance sales and marketing activities. Despite Benton's involvement in many of the corporations which comprised the enterprise, the enterprise and Benton were not identical. <u>See</u> <u>id.</u> (defendant's membership in the enterprise does not eliminate distinction between the enterprise and the culpable

person).  Further, the record shows that the enterprise engaged in some legitimate functions and maintained a discrete existence beyond that necessary to perform acts of mail and wire fraud.  Thus, the enterprise was sufficiently distinct from the predicate acts of racketeering activity to meet the requirements set forth in Turkette and Atlas Pile.  Accordingly, UHC adduced sufficient evidence for a jury to determine that an "enterprise" existed for purposes of its RICO claim.

### 2.  Association with and Participation in the Conduct of the Enterprise's Affairs

A RICO defendant must "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c).  Here, UHC presented ample evidence of Benton's participation in the enterprise.  Several witnesses attested to Benton's involvement in Comtell, PGM, and SUMI, Inc.  Benton himself admitted he was a computer consultant to Comtell and received payments from that entity through his corporation, BFT Management.  Therefore, UHC has satisfied this element.

### 3.  Racketeering Activity

To prevail under RICO, UHC was also required to demonstrate, at a minimum, two predicate offenses listed in 18 U.S.C. § 1961(1)(B); Atlas Pile, 886 F.2d at 990.  In this case, UHC alleged predicate offenses of mail fraud and wire fraud.  Mail and wire fraud are established through proof of: "(1) a scheme to defraud; (2) intent to defraud; (3) reasonable foreseeability that the mails (or wires) would be used; and (4) use of the mails (or wires) in furtherance of the scheme." Murr Plumbing, Inc. v.

<u>Scherer Bros. Fin. Servs. Co.</u>, 48 F.3d 1066, 1069 n.6 (8th Cir. 1995). Each of these elements was satisfied in this case.[5]

We have held that a scheme to defraud requires "some degree of planning by the perpetrator." <u>United States v. McNeive</u>, 536 F.2d 1245, 1247 (8th Cir. 1976). Here, such a plan is evidenced by an examination of the money trail, which consistently made its way to various corporations and accounts controlled by Benton rather than to the intended insurance companies. From Benton's systematic siphoning of premium funds, a jury could reasonably find that Benton had the intent to defraud UHC and other HANA members. Thus, UHC established the first and second elements of mail and wire fraud.

With respect to the third element, we conclude that it was foreseeable that the mails and wires would be used in carrying out the intended scheme. There can be little doubt that Benton understood a scheme to defraud UHC would require at least the appearance of a legitimate insurance purchase group with supporting services. Cultivating this appearance would require the wire transfer of premium funds and the mailing of premium checks and insurance certificates. Therefore, it was almost certain that the mails and wires would be used in carrying out the scheme to defraud.

Finally, UHC provided sufficient evidence to satisfy the fourth element, actual use of the mails and wires in furtherance of the scheme. Several witnesses at trial described both mail and wire transfers of premiums. For example, Mark Robis, the insurance intermediary who introduced IMACO to the HANA program, made

---

[5]Benton contends that UHC was required to demonstrate its detrimental reliance upon a misrepresentation or omission made by Benton. This contention lacks merit, as it is well settled that such a showing is not required to prove mail or wire fraud. <u>Atlas Pile</u>, 886 F.2d at 990-91 & n.4; <u>Murr Plumbing</u>, 48 F.3d at 1069.

repeated references to wire transfers from his office to Comtell. Mitzi King, co-founder of Comtell, testified that after premiums were received by Comtell, insurance certificates purporting to verify insurance coverage were mailed by Comtell to the HANA insureds. UHC's accounting expert Arthur Cobb also testified, based on his analysis of check registers and other bank documents, that premium funds were wire-transferred into accounts controlled by Benton. Although Benton contends these mailings were not fraudulent and were not a part of his scheme to defraud but were merely "incidental" to the operation of Comtell, this argument is to no avail. We have held that even a routine mailing (or wire use), or one sent for a legitimate business purpose may satisfy the "actual use" requirement "so long as it assists . . . in carrying out the fraud." United States v. Leyden, 842 F.2d 1026, 1028 (8th Cir. 1988). Therefore, we conclude that UHC presented sufficient evidence to establish the predicate acts of racketeering.

### 4. Pattern of Racketeering Activity

Although UHC clearly presented sufficient evidence to sustain the jury's finding of predicate offenses, RICO's language specifically requires that a plaintiff establish a "pattern" of racketeering activity. This language "implies `that while two acts are necessary, they may not be sufficient'" to constitute a pattern of racketeering activity. H.J. Inc. v. Northwestern Bell Tel., 492 U.S. 229, 237 (1989) (quoting Sedima, 473 U.S. at 496 n.14). Instead, to prove a pattern of racketeering activity, a plaintiff must show that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." Id. at 239 (emphasis original). The Court has stated that the "relatedness" element of this test embraces "`criminal acts that have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Id. at 240 (quoting 18 U.S.C. § 3575(e)). "Continuity," the Court has

held, is essentially a temporal concept, and may refer "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  Id. at 241.

Applying these principles to the evidence in the record, we find that UHC has adequately shown that Benton's racketeering activities manifested both relatedness and continuity.  The record indicates that Benton's racketeering activities in the enterprise were undertaken for the common purpose of defrauding HANA insureds, and that these activities were accomplished by a common method-- the systematic diversion of incoming premium moneys.  Each of the acts deprived HANA insureds of the coverage they believed they were purchasing.  These activities were undertaken regularly during Benton's lengthy association with HANA and therefore clearly demonstrate "continuity."  Accordingly, UHC's evidence was sufficient for the jury to determine that Benton's predicate acts constituted a "pattern" of racketeering activity under RICO.

### 5.  Causation and Damages

Section 1964(c) of the RICO Act provides that "[a]ny person injured in his business or property by reason of a violation of section 1962" may sue for threefold the damages sustained.  In Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992), the Supreme Court "construed the `by reason of' language to incorporate the traditional requirements of proximate . . . causation."  Bieter Co. v. Blomquist, 987 F.2d 1319, 1325 (8th Cir.), cert. denied, 114 S. Ct. 81 (1993).  In the RICO context, proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged."  Holmes, 503 U.S. at 268.  Once such a relationship is established, our cases allow a range of damages, subject to the limitations which typically apply in ordinary tort cases.  See Bieter, 987 F.2d at 1329.

Benton does not dispute these general principles. Instead, he argues that because insurance certificates and policies were in fact issued to the HMOs which applied for coverage through the HANA program, UHC received all of the insurance coverage for which it paid and therefore suffered no damages. Benton further contends that, even assuming damages were sustained, UHC cannot point to any act or omission on his part which caused that damage.

Benton's arguments are without merit. The record clearly demonstrates that UHC paid hundreds of thousands of dollars in insurance premiums on behalf of the HMOs it owned and managed. Due to the fraudulent acts of Benton, these premiums did not reach Victoria and Diversified, and therefore risks were never properly underwritten. Comtell's subsequent mailing of insurance certificates confirming the purported insurance coverage did not alter the fact that coverage was nonexistent. Thus, UHC failed to receive the benefit of its bargain, and has, as a result, sustained substantial financial damage. See Bennett v. Berg, 685 F.2d 1053 (8th Cir. 1982) (retirement community residents sustained damages when "Entrance Endowments" entitling a resident to occupy an apartment for life were reduced to ten percent of their intended value due to defendants' conversion of payments), aff'd on rehearing, 710 F.2d 1361 (8th Cir.), and cert. denied, 464 U.S. 1008 (1983). The jury's damage award reflects the amount of premiums paid by UHC on behalf of its HMOs, and is fully supported by the record. We therefore find that UHC presented sufficient evidence from which a reasonable jury could find that UHC had demonstrated the elements of causation and damages. Having determined that UHC demonstrated each element required to establish a violation of 18 U.S.C. § 1962(c), we conclude that the district court correctly denied Benton's posttrial motion for judgment as a matter of law.

C.   Evidentiary Rulings and the Special Verdict Form

-14-

Benton also challenges several of the district court's evidentiary rulings and his decision to reject Benton's proposed special verdict form. We note at the outset that Benton brought only a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. He did not bring an alternative motion for new trial pursuant to Rule 59 of the Federal Rules. Generally, parties filing motions for judgment as a matter of law are limited to arguing that there is no legally sufficient evidentiary basis supporting the jury's verdict. See Fed. R. Civ. P. 50(a)(1). Having decided that Benton's motion for judgment as a matter of law was properly denied, and given Benton's failure to file an alternative motion for a new trial, we are skeptical, at best, that we can grant a new trial based on evidentiary or jury instruction error. See Goldsmith v. Diamond Shamrock Corp., 767 F.2d 411, 414-15 (8th Cir. 1985) (when court believes the moving party is not entitled to judgment notwithstanding the verdict, it lacks power to grant a new trial unless it acts on the basis of a motion of a party pursuant to Rule 59(b) of the Federal Rules of Civil Procedure). Nevertheless, even if we do consider Benton's evidentiary and jury instruction arguments properly before this court, we note that a district court has wide discretion with respect to these issues, and its decision "will not be disturbed unless there is a clear and prejudicial abuse of discretion." Maddox v. Patterson, 905 F.2d 1178, 1179 (8th Cir. 1990); Bissett v. Burlington N. R.R. Co., 969 F.2d 727, 729 (8th Cir. 1992). Benton has failed to demonstrate that the district court abused its discretion in its trial rulings.

### 1. Arizona Litigation

Benton argues that the district court erred in excluding all evidence pertaining to lawsuits brought against Physician's Health Plan of Arizona. These lawsuits, brought by various members of Physician's Health Plan, became the subject of a protracted coverage dispute between UHC and Diversified, the insurer which,

through HANA, was to provide insurance to the HMO.  They also prompted UHC's investigation into the activities of HANA and its affiliated service companies.  Because UHC's complaint in the instant case initially sought to recover the costs of defending these lawsuits, Benton argues that the details of the litigation were relevant to the issues at trial and that exclusion of this evidence prejudiced his defense.

We disagree.  Although UHC originally filed suit against Benton and his co-defendants to recover the costs of defending the Arizona litigation, it eventually decided not to pursue these damages and at trial sought only to recover the premiums it had paid to the HANA program.[6]  After UHC changed its strategy, the substance of the Arizona lawsuits were no longer facts in issue.  Because Rule 401 of the Federal Rules of Evidence limits relevant evidence to that which makes the existence of a fact in issue more or less probable, the Arizona lawsuits were not relevant.  The district court properly excluded this evidence.

### 2. Other Evidence

Benton also asserts that the district court erred in admitting: 1) records downloaded from Comtell's computer; 2) forms indicating that HMOs managed but not owned by United HealthCare Management had assigned their claims against Benton to UHC; 3) testimony of Charles Huff, insurance investigator for the Georgia Department of Insurance and receiver for Victoria Insurance Company; 4) testimony of Arthur Cobb, UHC's accounting expert; and 5) testimony of David Gates, an expert on the Liability Risk Retention Act.  Benton argues that this evidence was unduly

---

[6]Indeed, the district court ruled that UHC could claim damages only for those HMOs which it owned through its subsidiary.  With one exception, the court disallowed claims for premiums paid on behalf of HMOs which were managed, but not owned, by United HealthCare Management.

prejudicial and therefore was admitted in violation of Rule 403 of the Federal Rules of Evidence, which provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[7]  We have considered each of Benton's contentions and find them to be without merit.  This evidence provided crucial insight into the workings of Benton's scheme.  Although the evidence was not favorable to Benton, none of it presented a danger of unfair prejudice which outweighed its probative value in demonstrating the elements of UHC's RICO claim.  Thus, the district court did not err in admitting this evidence at trial.

### 3.  Special Verdict Form

In his last challenge to the district court's trial rulings, Benton argues that the court erred in refusing to submit his proposed special verdict form to the jury and in submitting, instead, its own special verdict form.  We review the denial of a request for a special verdict form for an abuse of discretion.  E. I. DuPont de Nemours v. Berkley & Co., 620 F.2d 1247, 1271 (8th Cir. 1980).

As the district court correctly noted, Benton's jury form was rather long (seven pages) and somewhat argumentative.  The instructions ultimately presented to the jury, on the other hand, concisely stated the applicable law.  Benton urges us to find that

---

[7]It is not entirely clear from Benton's brief whether he is also appealing the admission of Comtell's computer records on hearsay grounds.  It is nevertheless apparent that Benton believed these records were not properly authenticated at trial.  We find, however, that although UHC's authentication of the data was unconventional and would not be adequate in all cases, UHC presented sufficient evidence to show that the records were an exception to the rule against hearsay.  See Fed. R. Evid. 803(6).

the district court's special verdict form, which presented three questions of ultimate fact, allowed the jury to circumvent its duty of sifting through the other instructions to understand the complexities of RICO.[8] We find nothing in the court's instructions, however, which would tend to encourage such a result. Nor has Benton produced evidence, short of speculation, that the jury did not carefully deliberate before reaching its verdict. We therefore uphold the district court's refusal to submit Benton's special verdict form.

### D. UHC's Cross Appeal

Following the trial of this case, UHC petitioned the court for attorney's fees and costs pursuant to section 1964(c) of RICO. In support of this application, UHC submitted a memorandum of law in

---

[8]The court submitted the following special verdict form to the jury:

1. Do you find from a preponderance of the evidence that the defendant violated Section 1962(c) of the RICO statute, as that offense has been defined for you?

Yes: _____ No: _____

Answer question 2 only if you have answered "Yes" to question 1.

2. Do you find by a preponderance of the evidence that any damage to United HealthCare was proximately caused by the defendant's violation of the RICO statute?

Yes: _____ No: _____

Question 3 relates to the appropriate measure of damages. Answer this question only if you have answered "Yes" to question 2.

3. What sum, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate the plaintiff, United HealthCare, for the damages it sustained which were proximately caused by Edmund Benton's violation of RICO?

$ _____.

which it argued that fees and costs are mandated by RICO.  UHC's memorandum further addressed each of the factors the Supreme Court has indicated are relevant to fee determinations in the federal civil rights context when a plaintiff prevails on less than all of his or her claims.  See Hensley v. Eckerhart, 461 U.S. 424 (1983).[9]  Finally, UHC submitted affidavits from two of the attorneys who worked on the case describing: 1) the work which had been done; 2) the names and billable rates of the attorneys who had participated in the case; 3) how the tasks performed in the case were necessary to its successful resolution; 4) the total time billed; and 5) the total amounts of fees and costs requested.  UHC submitted none of its actual billing records, but did offer to provide for the court's in camera review itemized billing statements detailing the time spent and costs incurred in the case.

The district court denied UHC's petition without a hearing.  In its order, the court noted the length of the litigation and its inclusion of multiple defendants and claims.  It then found that UHC's submission failed to adequately delineate the time and effort spent on claims against the other defendants in the case, many of whom were voluntarily or involuntarily dismissed.  The court determined that, given the deficiencies in UHC's fee application, it was not able to calculate a reasonable fee.

----

[9]The twelve Hensley factors include:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

461 U.S. at 430 n.3.

Although the question of when to award attorney's fees and costs in a RICO action has never before been squarely before us, we have had occasion in other circumstances to examine similar fee-shifting statutes. As we noted in these instances, we will generally not overturn a district court's decision on attorney's fees and costs absent an abuse of discretion. Walitalo v. Iacocca, 968 F.2d 741, 747 (8th Cir. 1992). "If the district court has used improper standards or procedures in determining fees, however, we will reverse." Id.

UHC argues that the district court's outright denial of attorney's fees and costs conflicts with RICO's statutory language and purpose, and therefore constitutes reversible error. We agree. Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." (emphasis added). This language indicates that an award of reasonable attorney's fees and costs under RICO is mandatory, and several courts of appeals have so held. See, e.g., Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1167 (2d Cir.), cert. denied, 114 S. Ct. 385 (1993); Quick v. Peoples Bank of Cullman County, 993 F.2d 793, 799 (11th Cir. 1993); FMC Corp. v. Varonos, 892 F.2d 1308, 1315 (7th Cir. 1990). Indeed, the Supreme Court has implicitly acknowledged the mandatory nature of the fee award, stating in H.J., Inc. that "a person found in a private civil action to have violated RICO is liable for treble damages, costs, and attorney's fees." 492 U.S. at 233. Such an interpretation is consistent with Congress' intent in enacting the civil portion of the RICO statute "to enlist the aid of civil claimants in deterring racketeering." Alcorn County, Mississippi v. U.S. Interstate Supplies, Inc., 731 F.2d 1160, 1165 (5th Cir. 1984). Thus, by failing to award both fees and costs to UHC for its efforts in prosecuting this suit, the district court acted contrary to both the plain language and the purpose of RICO.

Accordingly, we find that the district court abused its discretion in denying UHC's petition for costs and attorney's fees.

In concluding that the district court abused its discretion on this issue, we do not suggest that the district court must make a fee and cost award based on UHC's present submission.  It remains the fee applicant's burden to establish entitlement to a particular award by presenting adequate documentation of its efforts in the litigation.  See Hensley, 461 U.S. at 437.  In this case, it is apparent that the district court could benefit from additional summaries from UHC addressing the deficiencies the district court discussed in its order denying fees.  Moreover, the district court may wish to accept briefs on the standards which should guide its discretion in determining what constitutes a "reasonable" fee award under RICO.[10]  We therefore hold only that the district court abused its discretion in denying UHC's petition in its entirety, and remand to the district court so it may, with assistance from the litigants, make a determination of reasonable fees and costs.

**III. CONCLUSION**

For the foregoing reasons, the district court's judgment on the verdict is affirmed.  We reverse the district court's denial of

---

[10]We note, for example, that there is some disagreement among the courts regarding the extent to which the Hensley factors should apply in cases involving mandatory, rather than permissive, fee-shifting statutes.  See, e.g., Stochastic Decisions, 995 F.2d at 1168 ("Hensley analysis `is of limited applicability' to statutes that mandate an award of attorney fees") (quoting United States Football League v. National Football League, 887 F.2d 408, 412 (2d Cir. 1989)); Northeast Women's Center v. McMonagle, 889 F.2d 466, 470 (3d Cir. 1989) (applying Hensley approach when RICO plaintiff prevailed on only some of its claims), cert. denied, 494 U.S. 1068 (1990).  Although UHC's submission assumes that the Hensley factors apply in this context, neither party has briefed the issue and we decline to announce universal standards for RICO fee awards without a more fully-developed record.

attorney's fees and costs, and remand for further proceedings in accordance with this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.